IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

WILLIAM LANHAM,

      Petitioner,

v.                                      No. 1:19-cv-01064-JDB-jay
                                       Re: 1:15-cr-10038-JDB-1

UNITED STATES OF AMERICA,

      Respondent.

ORDER DENYING § 2255 PETITION,
DENYING CERTIFICATE OF APPEALABILITY,
AND
DENYING LEAVE TO APPEAL IN FORMA PAUPERIS

Petitioner, William Lanham,[1] has filed a pro se motion to vacate, set aside, or correct his sentence (the "Petition") pursuant to 28 U.S.C. § 2255.  (Docket Entry ("D.E.") 1.)[2]

BACKGROUND

In 2016, the federal grand jury for the Western District of Tennessee returned a four-count superseding indictment charging Lanham, an over-the-road truck driver, with the interstate transport of a minor with intent to engage in sexual activity in violation of 18 U.S.C. § 2423(a) (Count 1), production of child pornography in contravention of 18 U.S.C. § 2251(a) (Count 2), possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B) (Count 3), and interstate transport of child pornography in violation of 18 U.S.C. § 2252(a)(1) (Count 4).  (*United States v. Lanham*, Case No. 1:15-cr-10038-JDB-1 (W.D. Tenn.) ("No. 1:15-cr-10038-JDB-1"), D.E. 62.) The charged offenses related to Lanham's abuse of his twelve-year-old step-daughter, A.R.  The Defendant retained Attorney A. Russell Larson.

---

[1]The Court will refer to Lanham as the "Defendant" in its discussion of the underlying criminal case.

[2]Record citations are to documents filed in the present matter unless otherwise indicated.

The case proceeded to trial in November 2016.  The Government called Deputy Michael Lockhart from the Benton County, Tennessee, Sheriff's Department.  The officer testified that Defendant's wife, Jamie Lanham, arrived at the sheriff's office on May 9, 2014, to file a report regarding her husband.  She explained to Lockhart that she had seen texts on her daughter A.R.'s phone from Lanham that suggested the Defendant had been sexually abusing A.R.  She forwarded the texts to her own phone and showed them to the officer.  The texts, which were admitted as Government Exhibit 2, included the following messages from Lanham to the victim:

"I told your mom it would be cheaper for me to marry u she said hell no I think we r going to have to wait tel your 18 can u wail tel then"

"Your welcome thank u for tellin me my ball r to full"

"What I love the most is leaving my seeds n u"

". . . I'm 42 and never felt this way about enyone nor has enyone . . . made love and make me fel one like u do. . . ."

"I just wanted to say I in joyed having our soft skin next to mine"

"I wanted to make love again"

"Not enoft time its no fun if u ant cuming"

"We were talking about u sleeping with me i took care of it"

"Just your soft sweet touch means everything"

"I'm happy now but when we are as one i have never been happyer than at the moment when we both expload together"

"Ok wishing u were here so i could give u some seeds"

"I been useing the pump"

"Did he fel bigger the last time"

"Did u like it"

(*Id.*, D.E. 106 at PageID 436, Gov't Ex. 2.)

The texts prompted Lockhart to speak with A.R. in the presence of a Department of Children's Services ("DCS") caseworker. Jamie Lanham then took her daughter to be seen by a nurse trained in sexual assault examinations. Lockhart, who retained possession of the victim's phone by permission of her mother, observed a text message from the Defendant come through on the phone asking A.R. "have you taken your prenatal[?]" (*Id.*, D.E. 106 at PageID 441.)

Lockhart further testified that, in the late hours of May 9, 2014, he and a DCS caseworker went to Lanham's residence. While the caseworker spoke with the Defendant's children and step-children, Lockhart approached Lanham as he returned home after having been on the road for several days. The officer asked Petitioner to come to the station to answer questions about images and texts relating to the minor victim and Petitioner agreed to do so. Lockhart stated that he "told [Lanham] that [he] would give him a ride" to the station because Lanham "didn't feel comfortable or didn't want to drive [his] semi truck[.]" (*Id.*, D.E. 106 at PageID 446.) Lockhart, Lanham, and the caseworker rode in the patrol vehicle to the station.

During the unrecorded interview that ensued in the early hours of May 10, 2014, Lockhart asked the Defendant about the "prenatal" message on A.R.'s phone. Lanham told the officer that he was referring to vitamins. Lockhart then showed him "a text about emptying his sack in" A.R. (*Id.*, D.E. 106 at PageID 447-48.) The officer recalled that Lanham became quiet and "didn't say anything at first." (*Id.*, D.E. 106 at PageID 448.) After "a long pause [Lanham] look down . . . [a]nd . . said, I have a problem, I need help." (*Id.*, D.E. 106 at PageID 448.)

Lockhart then read the Defendant his Miranda rights and Lanham signed a waiver. (*Id.*, D.E. 106 at PageID 448; Gov't Ex. 3A.) When asked if he and A.R. "had engaged in sexual

activity o[r] had sexual intercourse," Lanham said "no." (*Id.*, D.E. 106 at PageID 449.)  However, when Lockhart "told him that [he] had spoken to [A.R.] and she [had] made [him] aware that there had been sexual contact between the two[,]" Lanham "admitted that there had been." (*Id.*, D.E. 106 at PageID 450.)  Lanham then initialed a written statement representing that he and the victim had engaged in sexual activity two times. (*Id.*, D.E. 106 at PageID 451-52; Gov't Ex. 3B.)  He also provided a written statement in which he explained "I think it was Tuesday.  I used a penis pump.  She got on top.  I didn't get off." (*Id.*, D.E. 106 at PageID 496; Gov't Ex. 4.)  Lanham was informed that he was going to be charged with engaging in sexual conduct with a minor.  Lockhart recalled that Lanham agreed to a search of his truck, which uncovered a penis pump. (*Id.*, D.E. 106 at PageID 455-57; Gov't Ex. 5.)

Lockhart and Chief Investigator Bryant Allen both testified that they interviewed Lanham two days later, on May 12, 2014, while he was in police custody.  Defendant was informed of his Miranda rights and he signed a waiver. (*Id.*, D.E. 106 at PageID 458; D.E. 108 at PageID 878; Gov't Ex. 6.)  Allen recalled that Lanham asked if he could call his mother and that Allen used his own cell phone and "tried to call her number several times, got a voicemail." (*Id.*, D.E. 108 at PageID 879.)  The officer recalled that "as we were waiting to see if she would respond and see about him asking her some questions, he just talks while we are sitting there." (*Id.*, D.E. 108 at PageID 879.)  Lanham "said, I didn't rape her.  I never held her down and forced myself into her." (*Id.*, D.E. 108 at PageID 879.)  Defendant also stated that he "needed some help." (*Id.*, D.E. 108 at PageID 880.)  Lockhart similarly recalled that Lanham told them "that he didn't forcibly rape [A.R.], that she wanted it . . . that she was trying to get on top of him and he had to force her off." (*Id.*, D.E. 106 at PageID 459.)

Lockhart further testified that "that night" Lanham "agree[]d to give" him his cell phone. (*Id.*, D.E. 106 at PageID 460.)  On recall direct examination, he was asked about the warrant he secured for a search of the phone:

> Q. Deputy Lockhart, did you obtain a search warrant for a phone belonging to William Lanham?
>
> A. Yes.
>
> Q. Did you need—or did you obtain a serial number so that the phone could be identified in the search warrant?
>
> A. Yes.
>
> Q. How did you obtain that serial number?
>
> A. I pow[ere]d on the phone.  Went into the settings.  I don't know that I can describe it step by step, but in the settings there is a list of information regarding the phone and one of them was the serial number.

(*Id.*, D.E. 107 at PageID 620.)

Lockhart applied for the warrant two days later (D.E. 21-1 at PageID 173) and subsequently sent Defendant's phone, as well as the victim's phone, to the "lab" at the Tennessee Bureau of Investigation ("TBI").   (No. 1:15-cr-10038-JDB-1, D.E. 106 at PageID 462.)   The TBI's examination of Defendant's phone revealed twelve photographs of a "[v]ery close-up shot of a female anatomy, a vagina."  (*Id.*, D.E. 106 at PageID 464.)  Lockhart had a second meeting with A.R., at which she stated that the images were of her.  (*Id.*, D.E. 106 at PageID 466-67.)

An FBI special agent testified regarding the analysis of the Defendant's and A.R.'s phones. He stated that the twelve images of the female genitals had been created by Lanham's phone after the spring break trip, on five separate dates in April 2014.  (*Id.*, D.E. 107 at PageID 722-32; Gov't Ex. 14.)

Bett Jewell, Director of the Carl Perkins Child Advocacy Center, testified to the separate forensic interviews she conducted with A.R. and A.R.'s brother and sister.  She recalled that A.R. revealed that the first time she and her stepfather had sex was in the family trailer home, which had burned in December 2013.  A.R. reported that some of the abuse took place in Lanham's truck when it was parked next to the trailer home.  The victim also told Jewell that she "had traveled with [Lanham] on spring break for a week," and that they had sex during that time.  (*Id.*, D.E. 106 at PageID 506.)

The director of schools for the Benton County Board of Education testified that the 2014 spring break for the school A.R. attended at the time was held on "April 7th through April 11th."  (*Id.*, D.E. 107 at PageID 641.)  Carla Rexing, an FBI intelligence analyst, testified that she reconstructed the Defendant's work travel from his employer's business record.  During the period of the victim's spring break, the records showed that Lanham made stops in Kentucky, Mississippi, Georgia, Indiana, and Alabama.  (*Id.*, D.E. 107 at PageID 634-35.)

A.R. testified that Lanham began engaging in sexual contact with her when she was "[a]bout eight years old."  (*Id.*, D.E. 107 at PageID 679.)  She recalled that she traveled with the Defendant in his truck during her 2014 spring break when they had intercourse and that "[s]ometimes he would take this blue pill" before sex.  (*Id.*, D.E. 107 at PageID 683.)  She also related that Lanham used "this little pump thing to make his penis harder" before intercourse.  (*Id.*, D.E. 107 at PageID 684.)  The prosecutor showed A.R. the texts introduced as Government Exhibit 2 and she stated they were from Lanham and explained what they meant.  (*Id.*, D.E. 107 at PageID 686-90.)  The victim recalled that the Defendant took nude photographs of her vagina with his cell phone, explaining that Lanham told her he wanted the images to "look at . . . while he's over the

road." (*Id.*, D.E. 107 at PageID 691-92.)  She confirmed that the twelve images of female genitalia were "[p]ictures that [Lanham] took" of her.  (*Id.*, D.E. 107 at PageID 693.)

Pursuant to Federal Rule of Evidence 414, the victim's sister testified that the Defendant had touched her "breasts and [her] vagina, and grabbed at [her] butt."  (*Id.*, D.E. 107 at PageID 650.)  She recalled that on one occasion he "grabbed [her] by [her] wrists and tried pulling [her] to the bed and said that [she] was going to have sex with him now."  (*Id.*, D.E. 107 at PageID 650-51.)  The witness further stated that the Defendant made sexual comments to her, including that "he wanted to fuck [her] one day and then also threaten[ed] to rape" her.  (*Id.*, D.E. 107 at PageID 650.)  She related that she had observed Lanham and A.R. "kissing on each other" as "couples kissing" and that "as their relationship progressed, they started holding hands in public."[3]  (*Id.*, D.E. 107 at PageID 652.)

The defense theory was that Lanham could not sustain an erection because of health problems and that his then-wife, Jamie Lanham, was responsible for the text messages and pornographic images recovered from his phone.  The defense called the victim's biological father as a witness.  He testified that Lanham "was strict, but he was good to" the children and that he did not observe him "in any way messing with them in the wrong way."[4]  (*Id.*, D.E. 108 at PageID 798.)  He did not see or sense anything wrong or inappropriate and recalled that the children "seemed like they was happy[.]"  (*Id.*, D.E. 108 at PageID 799.)

---

[3]The Court considered the admissibility of the testimony of the victim's sister and brother, which was offered to show other acts of child molestation.  The Court ruled that the sister's testimony was admissible but that most of the proffered testimony of the brother could not come in because it was more prejudicial than probative.  (No. 1:15-cr-10038-JDB-1, D.E. 106 at PageID 382-84; D.E. 107 at PageID 530.)

[4]The defense also called the custodian of Defendant's medical records, but the Court ruled that the witness was not "qualified to go into a diagnosis and interpret what [Lanham's] medications [were]."  (No: 1:15-cr-10038-JDB-1, D.E. 108 at PageID 782.)

Defendant's girlfriend, Ashley Cole, testified that she and Lanham had been in a one- or two-year romantic relationship that started in the fall of 2014.  (*Id.*, D.E. 108 at PageID 803, 809-10.)  She stated that they never had sexual intercourse because "[h]e couldn't sustain an erection or get an erection."  (*Id.*, D.E. 108 at PageID 804.)  She explained that he "used a penis pump but not a blue pill."  (*Id.*, D.E. 108 at PageID 806.)  On cross-examination, she confirmed that "when [she] did attempt intimacy with Mr. Lanham, . . . he used a penis pump."  (*Id.*, D.E. 108 at PageID 810.)

Lanham's mother related that she observed "[n]othing . . . inappropriate" about "how the children were treated, how they acted, especially in relation to" the Defendant.  (*Id.*, D.E. 108 at PageID 820.)  She remembered that she had lived with her son and his family between 2010 and 2012.  During the times she spent with A.R., the victim never talked to her "about any sexual activities" or "complain that she didn't feel like she was being treated unfairly," and that none of the "other children talk[ed] to [her] about things like that[.]"  (*Id.*, D.E. 108 at PageID 821.)

Lanham testified on his own behalf.  He denied that he ever had sex with the victim or took photos of her.  He believed that his wife, Jamie Lanham, created the text messages and images on his cell phone.  He explained that he had three cell phones and that it was "not uncommon for [him] to leave one at home."  (*Id.*, D.E. 108 at PageID 830.)  He described Jamie as "a very jealous type person" who would not permit the children to speak with him on the phone when he was away.[5]  (*Id.*, D.E. 108 at PageID 830, 835.)  He recalled that Jamie set up the phones so that, if he sent a text to one of the children, including A.R., Jamie would receive the same text on her phone.

---

[5]In a sidebar conducted upon the prosecutor's objection, the Court ruled that it would allow Lanham to testify about his ex-wife's jealousy and his "opinion" that she took the photographs and sent the texts.  The Court explained that, although there was no apparent factual predicate for the Defendant's belief that his wife created the images and the texts, the Government would "have the right to cross-examine him."  (No. 1:15-cr-10038-JDB-1, D.E. 108 at PageID 833.)

He further asserted that, on one occasion, he discovered that his wife had sent a "sexual text" from A.R.'s phone to his. (*Id.*, D.E. 108 at PageID 840.) Lanham again denied taking the twelve images of the victim's genitals or "hav[ing] someone take those pictures on [his] behalf. (*Id.*, D.E. 108 at PageID 841.) He stated that he had no knowledge of how those images came to be on his phone and reiterated that his wife had access to that phone. He also contested that he ever grabbed A.R.'s sister by the wrist and attempted to drag her into bed. The Defendant reported that he had several heart attacks and that he takes a medication for high blood pressure. Since his heart attacks, he claimed he could not get an erection. He acknowledged that he "used a penis pump" but refuted that he "ever used [it] around" A.R., "show[ed] it to her" or "demonstrate[d] [to her] how it works." (*Id.*, D.E. 108 at PageID 844.)

On cross-examination, Defendant was asked whether Lockhart had "forced [him] to give [incriminating] answers." (*Id.*, D.E. 108 at PageID 857.) He replied that the officer told him what to say and that he initialed the written statements as a way of "provok[ing]" or "instigating" Lockhart with false information in response to the officer's alleged failure to "listen" to his protestations of innocence. (*Id.*, D.E. 108 at PageID 857.)

The jury returned guilty verdicts on all counts. (*Id.*, D.E. 77.) On March 7, 2017, the undersigned sentenced the Defendant to 420 months' incarceration, to be followed by a five-year term of supervised release. (*Id.*, D.E. 97.)

Lanham appealed. (*Id.*, D.E. 99.) His appointed appellate attorney was Amy Lee Copeland. Because counsel concluded there were no meritorious grounds for appeal, including with respect to any suppression issues, she filed a motion to withdraw her representation and a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967). Upon review of the record, the Sixth Circuit noted "that trial counsel preserved very few issues for appeal[.]" (*Id.*, D.E. 129 at PageID

1678.)  In particular, "counsel [did not] move to suppress incriminating statements that Lanham made to investigators" and "did not assert any error in the search of [Lanham's] cellphone or of his tractor-trailer."  (*Id.*, D.E. 129 at PageID 1678-79.)  The court reviewed the trial evidence and found that "no non-frivolous issue[s]" could be raised regarding the sufficiency of the evidence or "in connection with the admission of [the Defendant's] statements or the evidence recovered as a result of his admissions."  (*Id.*, D.E. 129 at PageID 1679.)  The court therefore granted appellate counsel's motion to withdraw her representation and affirmed the convictions and sentence.

DISCUSSION

Lanham filed the Petition which he signed under penalty of perjury on March 28, 2019.  In Claim 1A, he asserts that trial counsel rendered ineffective assistance by failing to file a motion to suppress the evidence seized from his truck and his cell phone, as well as his incriminatory statements in the two police interviews.[6]  He maintains in Claim 1B that appellate counsel was ineffective for filing an Anders brief in lieu of filing a merits brief on suppression issues.  In Claim 2, he posits that trial counsel was ineffective for failing to move to dismiss one count of the indictment as violative of the double jeopardy bar and in Claim 3, he challenges counsel's failure to move for an acquittal based on insufficient evidence.  He also insists that trial counsel's alleged ineffective assistance in failing to file a suppression motion and to challenge the indictment deprived him of due process (Claim 4).[7]

---

[6]Petitioner does not specify what evidence he believes Lockhart obtained from his cell phone.  He also does not contradict Lockhart's description of the search as having been limited to powering up the phone and obtaining of the phone's serial number.

[7]The claims were first considered in the record-expansion order.  (*See* D.E. 18 at PageID 150-51.)  Because Petitioner is proceeding pro se, the Court construed the claims by reviewing not only the Petition but also the inmate's reply.  The Court agrees with the Government that the claims are all based on allegations of ineffective assistance of counsel.  Although Petitioner was permitted to file a supplemental reply following expansion of the record (*see id.* at PageID 155), he did not

On February 20, 2020, the United States, as Respondent, filed an answer to the Petition (D.E. 11) but it was not accompanied by an affidavit from trial counsel.  Regarding Claim 1A, Respondent argues that a suppression motion would not have been viable and, thus, trial counsel did not provide ineffective assistance by failing to file one.  As to the warrantless search of Petitioner's cell phone in particular, the Government notes that a search of the phone was later undertaken pursuant to a warrant. The United States also argues that counsel "was . . . able to watch the recorded [second] interview and see Petitioner sign a waiver[] and speak freely and voluntarily with investigators—something that no doubt factored into his decision to not file a motion to suppress . . ." (*Id.* at PageID 65.)  In response to Claim 1B, the Government maintains that appellate counsel was not ineffective for filing an Anders brief because nothing in the trial court record revealed an arguable suppression issue.  Respondent also contends that Claims 2 and 3 are likewise without merit.  Petitioner filed a reply, insisting that he is entitled to an evidentiary hearing. (D.E. 16.)

---

do so, and thus does not object to the Court's construction of his claims as set forth in the record-expansion order.

However, even if Lanham means to also assert stand-alone Fourth and Fifth Amendment challenges, those claims would be denied.  Fourth Amendment claims are not cognizable in § 2255 proceedings. *See Ray v. United States*, 721 F.3d 758, 761-62 (6th Cir. 2013) (relying on *Stone v. Powell*, 428 U.S. 465 (1976)).  Fifth Amendment claims are waived if not raised on direct appeal unless the failure can be excused, such as through a showing that counsel rendered ineffective assistance.  *See Poulsen v. United States*, 717 F. App'x 509, 513 (6th Cir. 2017) (quoting *Huff v. United States*, 734 F.3d 600, 605-06 (6th Cir. 2013)) ("A claim that would otherwise be waived may be raised through a collateral attack under § 2255 if a defendant 'can demonstrate cause and prejudice to excuse his default.' 'Ineffective assistance of counsel can constitute cause for a procedural default.'").  Because, as discussed *infra*, Petitioner cannot prevail on his assertion that trial and appellate counsel were ineffective for failing to raise a Fifth Amendment issue, he therefore would not be entitled to review of a stand-alone Fifth Amendment claim.

On November 19, 2021, the Court ordered expansion of the record.  (D.E. 18.)   It determined that it could not address the Government's argument that the warrantless search of the cell phone was irrelevant without reviewing the application supporting the later-obtained search warrant.  The Court also found that it could not accept the United States' characterization of the second interview as non-coercive without viewing the videotape, and that the Government's guesses as to trial counsel's decision-making and investigations would be better explained by counsel's own affidavit.  The United States was therefore ordered to submit a copy of the search warrant application, a digital copy of the second interview, and an affidavit from counsel.  The Court further directed the Government to file a supplemental answer and granted Petitioner leave to file a supplemental reply.  The United States submitted the required materials (D.E. 21-1) and a supplemental answer on December 17, 2021 (D.E. 22).  Petitioner did not offer a supplemental reply.

The Court has reviewed the parties' submissions, the record in the underlying criminal case, and the additional materials submitted in compliance with the record-expansion order.  The Court finds that the record conclusively shows that Petitioner is not entitled to relief on any of his claims.

I.    Section 2255 Legal Standards.

"A prisoner seeking relief under 28 U.S.C. § 2255 must allege either:  (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid."  *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (internal quotation marks omitted).  "In reviewing a § 2255 motion in which a factual dispute arises, the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims."  *Valentine v. United States*, 488 F.3d 325, 333 (6th

Cir. 2007) (internal quotation marks omitted). "[N]o hearing is required," however, "if the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Id.* A petitioner has the burden of proving that he is entitled to relief by a preponderance of the evidence. *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).

Proceedings under § 2255 are not a substitute for direct appeal. *Massaro v. United States*, 538 U.S. 500, 503-04 (2003). Therefore, "the general rule [is] that claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice" to excuse the procedural default. *Id.* at 504. A petitioner may also seek to overcome the default on the ground "that he is 'actually innocent'" of the crime of conviction. *Bousley v. United States*, 523 U.S. 614, 622 (1998) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

II.   Claim 1:  Ineffective Assistance of Counsel Regarding Suppression Issues.

In Claim 1A, Petitioner asserts that trial counsel rendered ineffective assistance by failing to file a motion to suppress the incriminating statements he gave during the two police interviews, the penis pump seized during the warrantless search of his truck, and the evidence Lockhart obtained during his warrantless search of his cell phone. In the Petition, which was signed under penalty of perjury, the inmate alleges that he was coerced through police threats into waiving his Miranda rights and that his multiple requests for an attorney during the police interviews were ignored. He also insists that he was in custody prior to Miranda warnings being given at the first interview because Lockhart approached him at nearly midnight on May 9, 2014, told him "he had to go" to the police station, "plac[ed] [him] into the back seat of the patrol car[,]" and "never told [him] that he could leave or decline to go with" him. (D.E. 1 at PageID 16 (brackets omitted).) Petitioner avers that he told trial counsel about these circumstances and that counsel ignored his

13

request that a suppression motion be filed.[8]  He maintains in Claim 1B that appellate counsel rendered ineffective assistance by failing to submit a merits brief on the suppression issues.

The Government argues that trial and appellate counsel did not perform deficiently because there was no basis for a suppression motion.  In trial counsel's affidavit, which Respondent submitted in compliance with the record-expansion order, counsel describes the efforts he undertook during his representation of Lanham.  He avers that he obtained and reviewed discovery materials; examined the "Waiver of Rights signed by Mr. Lanham [and] a handwritten statement initialed by Mr. Lanham in regard to his involvement with the minor child," both of which were given "while [he was] in the custody of the Benton County Sheriff"; "obtain[ed] and review[ed] the Transcript of the Detention Hearing"; "receive[d] and reviewed numerous text messages between the Defendant Lanham and the minor child many of which were sexually graphic and contained [on] the telephone of Mr. Lanham"; and contacted potential witnesses.  (D.E. 21-2 at PageID 178-79.)  Regarding Petitioner's allegation that he told counsel that he was threatened into signing the Miranda waivers, counsel represents that,

> [a]t no time did Mr. Lanham ever inform me that he had been threatened, coerced, or tricked by Law Enforcement to sign the statement.  It was my opinion at all times pertinent to my representation with Mr. Lanham that he was mentally competent and in fact had functioned as a long-haul truck driver and possessed a CDL license which would also require annual physical evaluations.
>
> In light of the statements of Mr. Lanham to me in regard to the voluntariness of his statements to Investigators I did not deem it appropriate to file Motions to Suppress.

(*Id.* at PageID 178.)

---

[8]Because Claims 1A and 4 are both based on the alleged ineffective assistance of trial counsel, they will be considered together.

The video recording of the second interview, also submitted by the Government in compliance with the record-expansion order, does not show the officers threatening Petitioner into signing the Miranda waiver or Petitioner unambiguously asking for an attorney.

A. Legal Standards.

A claim that an attorney's ineffective assistance has deprived a criminal defendant of his Sixth Amendment right to counsel alleges an error of constitutional magnitude that is cognizable under § 2255. *See Pough*, 442 F.3d at 964. Such a claim is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668 (1984). *Id.* at 966. To succeed on an ineffective-assistance claim, a petitioner must demonstrate two elements: (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

To establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. A court considering a claim of ineffective assistance must apply "a strong presumption" that the attorney's representation was "within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted).

To demonstrate prejudice, a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "It is not enough 'to show that the errors had some conceivable effect on the

outcome of the proceeding.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 693). Instead, "[c]ounsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687).

"A single, serious error may support a claim of ineffective assistance of counsel." *Hendrix v. Palmer*, 893 F.3d 906, 922 (6th Cir. 2018) (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 383 (1986)) (brackets omitted). "Such an error can flow from a failure to file a plainly meritorious motion to suppress." *Id.* (citing *Kimmelman*, 477 U.S. at 375, 385). "But the failure to file a meritorious suppression motion does not constitute *per se* ineffective assistance of counsel." *Id.* (quoting *Kimmelman*, 477 U.S. at 384) (brackets and internal quotation marks omitted). "For such a failure to constitute deficient performance, the meritorious nature of the motion must be so plain that no competent attorney would think a motion to suppress would have failed." *Id.* (quoting *Premo v. Moore*, 562 U.S. 115, 124 (2011)) (internal quotation marks omitted). "A petitioner also must show that counsel had no reasonable strategic rationale for not filing the motion." *Id.* (citing *Davis v. Lafler*, 658 F.3d 525, 537 (6th Cir. 2011) (en banc)).

"Under the Fifth Amendment, a suspect is guaranteed the right to remain silent and the right to assistance of counsel during a custodial interrogation." *Tolliver v. Sheets*, 594 F.3d 900, 916 (6th Cir. 2010) (citing *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966)). In *Miranda*, the Supreme Court held that the prosecution

> may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

16

*Miranda*, 384 U.S. at 444. "[U]nwarned statements made during a custodial interrogation are not admissible, regardless of whether the statements were voluntary or whether a constitutional violation occurred." *United States v. Crowder*, 62 F.3d 782, 786 (6th Cir. 1995).

Even when a "suspect effectively waives his right to counsel after receiving the [Miranda] warnings," if he "requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Davis v. United States*, 512 U.S. 452, 458 (1994). "To compel officers to end questioning, a 'suspect must unambiguously request counsel.'" *United States v. Potter*, 927 F.3d 446, 450 (6th Cir.) (quoting *Davis*, 512 U.S. at 459), *cert. denied*, 140 S. Ct. 436 (2019).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . ." U.S. CONST. amend. IV. "It is well settled . . . that a search conducted without a warrant issued upon probable cause is 'per se unreasonable subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)) (ellipses omitted). "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Id.* (citing *Davis v. United States*, 328 U.S. 582, 593-94 (1946)).

B. Claim 1A: Trial Counsel Ineffective Assistance.

1. Warrantless Search of Lanham's Phone.

As mentioned herein, Lockhart powered on and scrolled through Petitioner's cell phone to retrieve the serial number to be used in a search warrant application. The inmate alleges that he did not consent to Lockhart's search. The Government argues that the alleged illegal search of the

phone is irrelevant in light of the fact that a search warrant for the phone was later obtained.  As discussed earlier, the search of the phone pursuant to the warrant revealed incriminating texts that were sent to the victim, as well as pornographic images of her.  In support of its position, and in compliance with the Court's order for expansion of the record, the Government submitted the search warrant application.  The application consists of Lockhart's affidavit, in which he averred that,

> [o]n May 9, 2014, Jamie Lanham reported to the affiant, Mike Lockhart, that her 12 year old daughter A[.R.] was receiving explicit text messages from her step-father (William Lanham) indicating that they were involved in a sexual relationship.  Jamie Lanham forwarded these texts to her phone and brought them to the sheriff's office where she reported the incident.  A[.R.] did reveal to DCS that there was a sexual relationship between her and William Lanham.  A[.R.'s] mother turned A[.R.'s] phone over to Mike Lockhart.  The affiant did observe at least one text message that appeared during the text message [to A.R.] from William Lanham, asking her if she had taken a prenatal.  One of the messages sent to A[.R.] from William Lanham's phone is in reference to the use of a penis pump.  "I been using the pump" & "Did he feel bigger the last time" are seen on the forwarded messages that the mother, Jamie Lanham, brought forth.  A penis pump was recovered from a consent search at William Lanham's truck.

(D.E. 21-1 at PageID 166.)  The application identified the cell phone to be searched as a "MODEL NO LG-L38C" "BLACK LG TRACPHONE CELL PHONE" belonging to Lanham and associated with certain "MEID HEX" and "MEID DEC" numbers, as well as a "MOBILE ID #" beginning with the area code "731." [9]  (*Id.*)

"The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation."  *Nix v. Williams*, 467 U.S. 431, 443 (1984).  In *Murray v. United States*, 487 U.S. 533 (1988), the Supreme Court held that a search

---

[9]The Court assumes the "MEID" numbers in the application comprise the "serial number" Lockhart referenced at trial.  The "MOBILE ID #" in the warrant application appears to be Lanham's ten-digit telephone number beginning with the area code 731, which is associated with western Tennessee.

pursuant to a warrant is not independent of a preceding unconstitutional search if "the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." *Murray*, 487 U.S. at 542 (internal footnote omitted); *see also United States v. Jenkins*, 396 F.3d 751, 758 (6th Cir. 2005). Regarding the first prong of the test, the *Murray* Court explained that the question is whether "the agents would have sought a warrant if they had not earlier" proceeded unconstitutionally. *Murray*, 487 U.S. at 543. A search warrant will survive the second prong of *Murray*'s test if it "contains probable cause apart from the improper information." *Jenkins*, 396 F.3d at 758 (quoting *United States v. Herrold*, 962 F.2d 1131, 1141-42 (3d Cir. 1992)).[10]

In *United States v. Krushinski*, 131 F. App'x 478 (6th Cir. 2005) (per curiam), the Sixth Circuit applied the independent source test from *Murray* to the warrant federal law enforcement obtained to search the defendant's house. *Krushinski*, 131 F. App'x at 484-85. The defendant alleged "that his house was not visible from the road or any adjoining property because the property surrounding his house was hilly." *Id.* at 484. The Government acknowledged that "federal authorities illegally trespassed onto [the defendant's] property to obtain a photograph and description of his home, and . . . the description and photograph were used to obtain the warrant." *Id.* More specifically, the affidavit supporting the warrant application attached the photograph as

---

[10]The Sixth Circuit in *Jenkins* held that the warrant was independent of the prior illegal search, but it did not explicitly apply *Murray*'s first prong in reaching that decision. That is, the court did not expressly rule that the officers would have sought the warrant even without the unconstitutional search. However, the facts in that case showed that law enforcement's decision to seek a warrant was made prior to the unconstitutional search. *See Jenkins*, 396 F.3d at 755.

an exhibit and described the property using information from the photograph.  *Id.*  The affidavit also contained the property's street address, which was visible from the road.  *Id.*

The defendant "moved to suppress evidence found at his home as a result of the search warrant."  *Id.*  He argued "that the warrant was unlawful because it was the fruit of the unlawful trespass."  *Id.*  The district court denied the motion and the Sixth Circuit affirmed.  *Id.* at 484-85.  The court found that the independent source rule applied because, "[e]ven if a trespass on [the defendant's] property produced the photograph, the affidavit otherwise sufficiently described [the] property" using the street address.[11]  *Id.* at 485.

Lanham has not shown that counsel performed deficiently by failing to challenge Lockhart's warrantless search of his phone.  The circumstances in Lanham's case are analogous to those in *Krushinski*.  Like the officer in that case, Lockhart obtained identifying information about the property through an alleged illegal search, but he presented a warrant application to the magistrate which contained other, sufficient information to identify the property.  Specifically, Lockhart's application identified Petitioner's cell phone by the actual phone number associated with the device and with Lanham himself—information that would have been available from the cell phones of the victim and her mother.  The warrant application therefore contained a sufficient description of the property to be searched even if the serial numbers had been excised.[12]

---

[11]As in *Jenkins*, the Sixth Circuit in *Krushinski* held that the search warrant was independent of the illegal search, but it did not expressly address *Murray*'s first prong.

[12]Petitioner does not challenge the search warrant on the ground it is based in part on the penis pump seized from the alleged illegal search of his truck.  The Court nevertheless notes that the reference in the warrant application to the pump could have been excised from the document without diminishing probable cause for the search of Lanham's phone.  More specifically, the application was overwhelmingly based on other, legally acquired information, to wit:  the texts residing on the phones of the victim and her mother, the mother's statements to Lockhart, and the DCS report.

In addition, Petitioner has pointed to nothing to suggest that the serial numbers prompted Lockhart's decision to seek the warrant—that is, he has not identified anything to support the idea that the warrant would not have been sought had Lockhart not obtained the serial numbers. Indeed, Lockhart's testimony about powering up the phone and obtaining serial numbers to be used in the search warrant application implies that his decision to obtain the warrant was made before the purported unconstitutional search of the phone. The warrant affidavit further supports the notion that Lockhart would have sought a warrant even if he had not obtained the serial numbers. Specifically, his affidavit shows that he had already previously gathered weighty information from the victim, her mother, their cell phones, and a DCS report—all of which provided probable cause to search Lanham's cell phone. *See, e.g.*, *United States v. Price*, 558 F.3d 270, 282 (3d Cir. 2009) ("[I]t seems impossible that the police would not have applied for a warrant to search the basement of the house, knowing that:  1) confidential informants told the police that Price was operating a methamphetamine laboratory in the basement of the Page Road residence; 2) Price had sold Schirra methamphetamine in the past; 3) when arrested, Price had pH papers and baggies containing methamphetamine residue; and 4) Price's bedroom contained glass pipes with methamphetamine residue and a baggie of sodium hypophosphite.").

Some attorneys in the shoes of Lanham's trial counsel might have filed a motion to suppress based on Petitioner's allegation that he did not consent to Lockhart's search of his phone. But that is not the test Petitioner must meet to show deficient performance. Instead, he must demonstrate that the "meritorious nature of [a suppression motion was] so plain that 'no competent attorney would think a motion to suppress would have failed.'" *Hendrix*, 893 F.3d at 922 (quoting *Premo*, 562 U.S. at 124). Under the circumstances discussed above, the success of a suppression motion was not plain or clear. Petitioner therefore has not overcome the "strong presumption" that

counsel's performance was "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

2.   Lanham's Incriminatory Statements and the Warrantless Search of His Truck.

The Supreme Court in *Strickland* made clear that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697.  In the present matter, the Court does not reach the question of whether counsel performed deficiently by failing to challenge the admission of Lanham's incriminating statements from both interviews and the penis pump recovered during the warrantless search of his truck.  Instead, the Court assumes for the sake of analysis that counsel's conduct fell below an objective standard of reasonableness, but it finds that Petitioner suffered no prejudice as a result.[13]

More to the point, even if counsel should have moved to suppress the penis pump, Petitioner himself admitted during his trial testimony that he used a pump, although he denied using it with, or showing it to, the victim.  The Defendant's girlfriend, who was a defense witness, confirmed that Lanham had a penis pump.  In addition, if the pump and Lanham's incriminatory statements had been suppressed, there was sufficient additional evidence of Petitioner's guilt, to

---

[13]As mentioned earlier, the video recording of the second interview contradicts Petitioner's allegation that he was threatened into signing the Miranda waiver.  Nevertheless, because the Court has assumed for purposes of its analysis that the incriminating statements from the first interview were illegally obtained, it cannot determine on the record as currently developed whether the Miranda waiver at the second interview was effective.  Such an analysis would require fact-finding regarding the first interview.  *See Missouri v. Seibert*, 542 U.S. 600, 615 (2004) (plurality) (whether a Miranda warning, delivered after a confession was illegally obtained in an earlier round of questioning, is "effective enough to accomplish [its] object" depends on "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two [incriminatory] statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first"); *see also United States v. Ray*, 803 F.3d 244, 270-73 (6th Cir. 2015) (holding *Seibert* plurality test applies).

wit:  the victim's testimony that Petitioner had sex with her during a week-long trip over her spring break, that he took nude photos of her with his cell phone, and that the female genitalia in the photographs from Lanham's phone were pictures of her; school records showing the dates of the victim's spring break; employment records showing that Petitioner traveled out of state during the same time period; the forensic interviewer's testimony about the victim's statements to her regarding Lanham's abuse; the texts and images found on the Defendant's phone pursuant to the search warrant; the FBI agent's testimony that the images were created on that phone; and the sister's testimony about Lanham's sexual conduct toward her and her observations of him kissing and holding hands with the victim.  In light of the substantial evidence of guilt, Petitioner cannot demonstrate that there is a reasonable probability that the outcome of the verdicts would have been different absent the admission of his incriminatory statements and the penis pump.  *See Hicks v. Collins*, 384 F.3d 204, 215 (6th Cir. 2004) (petitioner could not establish that he was prejudiced by counsel's performance because proof of guilt was "overwhelming").

In sum, the record from the underlying criminal case and the expanded record developed in the present matter belie Petitioner's assertion that counsel rendered ineffective assistance by failing to file a motion to suppress.  Claims 1A and 4 are therefore DENIED.

C.  Claim 1B:  Appellate Counsel Ineffective Assistance.

As indicated *supra*, Petitioner posits in Claim 1B that appellate counsel was ineffective for failing to file a merits brief on suppression issues.  The record contradicts the claim.

*Strickland*'s two-part standard applies to a claim that appellate counsel was ineffective for filing an Anders brief instead of a merits brief.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  A petitioner asserting such a claim must demonstrate that counsel on direct appeal "unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them."  *Id.*  He must also

show a "reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on appeal." *Id.*

The record in Lanham's criminal case is at odds with his assertion that appellate counsel rendered ineffective assistance. Counsel filed a fifty-one-page brief and reviewed a number of potential issues, including whether there was any arguable basis for suppression of evidence. She found that there were no such arguable issues. The Sixth Circuit reviewed the record and concurred with counsel's assessment. (*See* No. 1:15-cr-10038-JDB-1, D.E. 129 at PageID 1679.) This Court's own review of the record confirms that the record provided no basis for a merits argument on suppression. Counsel therefore did not perform deficiently by filing an Anders brief.

What is more, because there was no arguable suppression issue, there is no reasonable probability that Lanham would have prevailed on appeal had counsel presented a merits argument. Her decision to file an Anders brief therefore did not prejudice her client. Prejudice is also elusive because the Sixth Circuit "advised [Lanham] of his right to" respond to counsel's motion to withdraw, but he did not do so. (*Id.*, D.E. 129 at PageID 1678.) Claim 1B is therefore without merit and is DENIED.

III.    Claim 2:  Ineffective Assistance Regarding the Indictment.

Petitioner asserts that counsel was ineffective for failing to challenge the indictment on the ground that its inclusion of both the interstate transport charge in Count 1 and the production charge in Count 2 violated "the rule against multiplicity and implicat[ed] the double jeopardy clause."[14] (D.E. 1 at PageID 27.) He posits that the charges are "the same" because the transport

---

[14]The Government addressed Claim 3 as if it were a challenge to the production and possession charges—Counts 2 and 3, respectively. Although Petitioner's presentation of the claim is somewhat confusing, the Court does not construe his argument to pertain to Counts 2 and 3. Nevertheless, even if the inmate meant to contend that an indictment that charges production and possession of child pornography in separate counts violates the Double Jeopardy Clause, the

offense contains the element "intent to engage in criminal sexual activity," while the crime of production prohibits "coercing and enticing . . . a minor to engage in sexual[ly] explicit conduct." (*Id*.)  The claim is without merit.

The Fifth Amendment's Double Jeopardy Clause provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb[.]"  U.S. CONST. amend. V.  The prohibition "protects individuals not only from successive trials, but also prohibits multiple punishments for the same offense."  *United States v. DeCarlo*, 434 F.3d 447, 454 (6th Cir. 2006). "Generally, an indictment may not charge a single criminal offense in several counts without offending the rule against 'multiplicity' and implicating the double jeopardy clause."  *United States v. Richards,* 659 F.3d 527, 547 (6th Cir. 2011) (quoting *United States v. Davis*, 306 F.3d 398, 417 (6th Cir. 2002)) (internal quotation marks omitted).  "A defendant may be convicted of multiple crimes arising from the same course of conduct so long as each charge 'requires proof of a fact which the other does not.'"  *United States v. Kurlemann,* 736 F.3d 439, 452 (6th Cir. 2013) (quoting *Blockburger v. United States,* 284 U.S. 299, 304 (1932)); *see also United States v. Kelly*, 204 F.3d 652, 656 (6th Cir. 2000) ("A defendant may be charged with multiple offenses based on the same underlying conduct as long as each offense requires proof of an element not required by the other.").

The statute underlying Count 1 of the superseding indictment in Lanham's criminal case makes it a crime to "knowingly transport[] an individual who has not attained the age of 18 years in interstate or foreign commerce, or in any commonwealth, territory or possession of the United

---

argument would be without merit.  *See United States v. Kniffley*, 729 F. App'x 406, 411 (6th Cir.), *cert. denied*, 139 S. Ct. 224 (2018) ("Because each statute requires proof of a fact that the other statute does not, [the defendant's] 2010 conviction for distributing and possessing child pornography did not bar his 2013 prosecution for producing some of the same images.").

States, with intent that the individual engage . . . in any sexual activity for which any person can be charged with a criminal offense[.]"  18 U.S.C. § 2423(a).  In pertinent part, production of child pornography, the charge brought in Count 2 of the superseding indictment, occurs when a person "employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct[.]"  18 U.S.C. § 2251(a).

The crimes are not a single criminal offense.  Most notably, the crime of transporting a minor with intent to engage in criminal sexual activity does not include an element relating to the production of visual images of sexually explicit conduct.  There was therefore no viable double jeopardy argument that counsel could have made.  In declining to challenge the indictment, counsel did not perform deficiently and his conduct did not prejudice Petitioner.  Claim 2 is DENIED.

IV.    Claim 3:  Ineffective Assistance Regarding Motion for Acquittal.

Lanham maintains that trial counsel was ineffective for failing to file a motion for acquittal.  *See* Fed. R. Crim. P. 29(a).  The claim is without merit because counsel did, in fact, move for a judgment of acquittal at the end of the prosecution's case, and his argument in support of the motion spanned nearly six pages of the transcript.  (*See id.*, D.E. 108 at PageID 759-64.)  The Court, however, denied the motion.  (*Id.*, D.E. 765.)

If Petitioner means to assert that counsel was ineffective for failing to renew his motion for judgment of acquittal at the close of all the evidence, the claim would be without merit on that ground as well.  A Rule 29 motion will be denied if "viewing the evidence in the light most favorable to the prosecution, any rational trier of facts could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Hogan*, Nos. 2:06-CR-10, 2:11-CV-312, 2015 WL 140341, at *11 (E.D. Tenn. Jan. 12, 2015) (quoting *Jackson v. Virginia*, 443 U.S. 307,

319 (1979)).  In Lanham's direct appeal, the Sixth Circuit reviewed the evidence submitted to the jury and determined that the Defendant "could raise no arguable issue that insufficient evidence supported his convictions."  (No. 1:15-cr-100-38-JDB-1, D.E. 129 at PageID 681.)  Therefore, trial counsel's failure to move for a judgment of acquittal at the close of proofs did not prejudice Petitioner.  Claim 3 is DENIED.

For the foregoing reasons, the Petition is DENIED.  Judgment shall be entered for Respondent.

## APPEAL ISSUES

A § 2255 petitioner may not proceed on appeal unless a district or circuit judge issues a certificate of appealability ("COA").  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).  A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2)-(3).  A substantial showing is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  "If the petition was denied on procedural grounds, the petitioner must show, 'at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'"  *Dufresne v. Palmer*, 876 F.3d 248, 252-53 (6th Cir. 2017) (per curiam) (quoting *Slack*, 529 U.S. at 484).

In this case, reasonable jurists would not debate the correctness of the Court's decision to deny the Petition.  Because any appeal by Petitioner does not deserve attention, the Court DENIES a COA.

Pursuant to Federal Rule of Appellate Procedure 24(a), a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit.  Fed. R. App. P. 24(a).  However, Rule 24(a) also provides that, if the district court certifies that an appeal would not be taken in good faith, the prisoner must file his motion to proceed in forma pauperis in the appellate court.  *Id.*

In this case, for the same reason it denies a COA, the Court CERTIFIES, pursuant to Rule 24(a), that any appeal in this matter would not be taken in good faith.  Leave to appeal in forma pauperis is therefore DENIED.[15]

IT IS SO ORDERED this 24th day of February 2022.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

---

[15]If Petitioner files a notice of appeal, he must also pay the full $505.00 appellate filing fee or file a motion to proceed in forma pauperis and supporting affidavit in the Sixth Circuit Court of Appeals within thirty days.